El Pueblo de Puerto Rico, demandante y apelado, *v.* Manuel Vázquez Ortiz, acusado y apelante.

No. 5551.—*Sometido:* Marzo 14, 1935. *Resuelto:* Abril 30, 1935.

*Angel M. Villamil* y *Gustavo Jiménez Sicardó,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Presidente Señor Del Toro, emitió la opinión del tribunal.

Manuel Vázquez Ortiz fué acusado por el Fiscal del Distrito de Humacao de un delito de asesinato en primer grado perpetrado en la persona de José Nicolás Matta en Naguabo el 12 de noviembre de 1932.

A fines del propio mes de noviembre, 1932, se leyó la acusación al acusado. Alegó su inocencia y pidió juicio por

jurado. Señalado el juicio fué suspendido dos veces a petición suya. El tercer señalamiento se hizo para el 6 de octubre, 1933. Dos días antes, pidió el traslado de la causa para el distrito de Guayama. La corte negó su solicitud al día siguiente, y al otro llamó la causa para juicio e insaculado el jurado fué aceptado por ambas partes. Practicada la prueba, informaron el fiscal y el abogado defensor. La corte dió sus instrucciones al jurado y éste rindió su veredicto declarando al acusado culpable de asesinato en segundo grado.

El 13 de octubre, 1933, solicitó un nuevo juicio. La corte negó la solicitud el 21 de noviembre siguiente y dictó sentencia en diciembre 4, imponiendo al convicto la pena de quince años de presidio con trabajos forzados.

No conforme, apeló para ante este tribunal. La transcripción quedó radicada en junio 12, 1934. Fué el apelante solicitando y obteniendo prórrogas hasta que al fin archivó su alegato en enero 28, 1935. La vista del recurso tuvo lugar en marzo 14, 1935 y así el caso quedó definitivamente sometido a nuestra consideración y resolución.

Se sostiene que la corte erró al denegar el traslado, al instruir al jurado y al no conceder el nuevo juicio, y que el veredicto del jurado es contrario a la prueba.

▆ Examinemos el primer error. La petición de traslado se basó en que un juicio justo e imparcial no podría obtenerse en el distrito de Humacao porque el interfecto José Nicolás Matta había sido persona de influencia en dicho distrito, hermano del Dr. Enrique Matta, ex-Senador del mismo, miembro prominente del Partido Socialista adversario del Partido Liberal al que pertenece el acusado; porque era también hermano y pariente de otras personas de alto relieve social, con buenas y variadas relaciones y gran influencia; porque el día del suceso, cuando el acusado fué trasladado del Cuartel de Policía de Naguabo al Depósito Municipal, se pretendió arrebatarlo a la policía, teniendo ésta que hacer grandes esfuerzos para salvar su vida, habiendo expresado

uno de los hermanos ese día dirigiéndose a la señora del interfecto: "No te apures, que dondequiera que lo cojamos, lo matamos"; porque estando recluído en la cárcel del distrito, el Doctor Matta estuvo de visita en ella sin que el acusado sepa por qué, habiéndole uno de los reclusos llamado la atención para que se escondiera porque su vida peligraba; porque el día de la lectura de la acusación fué acompañado a la corte por siete policías debido al temor que existía de que corriera peligro su vida, y porque debido a los rumores circulantes los familiares del acusado se abstuvieron de prestar fianza para ponerlo en libertad provisional decidiéndose a hacerlo al cabo de treinta días bajo la condición de que saliera del distrito.

La corte consideró la solicitud tardía y expresando además que no estaba convencida de la necesidad del traslado, lo negó.

Tardía fué en efecto la petición. Se presentó más de diez meses después de archivada la acusación y dos días antes del tercer señalamiento del juicio, habiéndose la vista suspendido las dos veces anteriores, según dijimos, a petición del propio acusado. Los hechos alegados como motivo para concluir que un juicio justo e imparcial no podía obtenerse en el distrito, ocurrieron a raíz del suceso y eran conocidos por el acusado desde un principio. Los meses transcurrieron y ninguna amenaza se materializó. No se alegó hecho alguno concreto demostrativo de la verdad de la conclusión.

Bajo esas circunstancias, no es posible sostener la existencia del error.

 Al señalarse el segundo error no se especifica de cuáles instrucciones de la corte al jurado se queja el apelante. Al argumentarse el señalamiento es que venimos en conocimiento de que la parte de las intrucciones objetadas fué la que sigue:

"No es necesario que la evidencia produzca certeza absoluta de los hechos alegados, sin posibilidad alguna de error. Si se fuera a

exigir prueba que produjera tal seguridad, rara vez podrían incoarse con éxito las acciones criminales.''

''Otros testigos declararon que esa tarde, viniendo por uno de los caminos de la colonia 'Montida', se acercaron a esa colonia el Sr. Nicolás Matta, acompañado de Nicolás Elías; se encontraron en un sitio del cual, de frente, venía precisamente el acusado; Nicolás Elías le llamó la atención a Nicolás Matta, a Colín, el primer mayordomo, diciéndole, 'allá viene don Manuel,' y que Matta se quedó callado y siguió caminando; que cuando lo alcanzaron a ver, estaban como a quinientos metros y cuando llegaron a cruzarse, cuando se encontraban como a cuatro o cinco pies de distancia unos de otros, entonces el acusado sacó un revólver y le comenzó a hacer disparos a Matta, etc.''

En primer lugar no consta que las instrucciones fueran excepcionadas. Esto solo bastaría para desestimar el error, de acuerdo con la constante jurisprudencia de esta corte sobre el particular. Véanse entre otros los casos de *El Pueblo* v. *Mercado,* 46 D.P.R. 152, *El Pueblo* v. *Maldonado,* 45 D.P.R. 417, y *El Pueblo* v. *Serrano,* 35 D.P.R. 335.

Parece, sin embargo, conveniente agregar que el primer párrafo transcrito no aparece aislado en las instrucciones. Es parte de otros que explican y completan el pensamiento y que se ajustan a la ley y a la jurisprudencia aplicables.

En cuanto al segundo párrafo impugnado, bastará decir que si bien hubo un solo testigo que declaró que vió cuando el acusado sacó el revólver y comenzó a hacer disparos a Matta, es lo cierto que hubo varios que lo vieron disparar contra Matta. La instrucción pudo ser más exacta, pero bajo las circunstancias no puede sostenerse que en la forma en que se trasmitió no encuentre apoyo en la prueba de tal modo que constituya un error fundamental perjudicial capaz de producir la revocación de la sentencia. Además, examinado en su totalidad el resumen de la prueba que las instrucciones contienen, se concluye que es imparcial y se ajusta a la verdad substancialmente.

■ Para la consideración de los errores tercero y cuarto alteraremos el orden de señalamiento comenzando por el último, o sea, por el que sostiene que el veredicto del jurado es contrario a la prueba.

Nueve testigos llamó el Pueblo a declarar. Cuatro el acusado incluyendo su propia declaración. Ramón Renta, Jefe de la Policía Insular del Distrito de Naguabo, inició la práctica de la evidencia de cargo.

Manifestó que en noviembre de 1932 se le presentó el acusado en el cuartel y le dijo ''que había tenido un disgusto en la colonia 'San Cristóbal' con el Sr. Matta y traté de interrogarle, pero no hizo manifestación ninguna, y en ese momento llamaron del hospital y fuí al sitio de los hechos y en el mismo camino vecinal encontré cuatro casquillos de revólver disparados.'' Llamaron de nuevo del hospital para comunicarle que el Sr. Matta había muerto de un balazo. Preguntó al acusado dónde había dejado el revólver y le contestó que no sabía dónde lo había puesto.

Nada repreguntó la defensa al testigo y el fiscal llamó a Richard C. McCoy, Jefe de Campo de la Fajardo Sugar Growers' Association. Declaró que el acusado trabajaba con él como segundo mayordomo, siendo primer mayordomo el interfecto Nicolás Matta, conocido por Colín. Que el día del suceso ''iba haciendo mis recorridos en la colonia con mi ayudante en un automóvil; yo entré a la colonia por la mañana como a las 9 ó 10—no estoy seguro—entré a la colonia, fuí al pesebre, pero no pude localizar al primer mayordomo ni ningún empleado porque no avisamos a tiempo. Al salir de la colonia San Cristóbal por el callejón que conduce del camino vecinal a Naguabo ví al segundo mayordomo Vázquez a caballo; al llegar el automóvil como acostumbramos saludamos y me hizo señas que parara. Paramos el carro, se bajó del caballo Vázquez y se acercó al automóvil del lado contrario que yo estaba sentado y me preguntó si yo había visto a Colín, le dije que no; entonces me dijo precisamente que él

quería hablar conmigo de que había llegado a un estado de imposibilidad de seguir trabajando en 'San Cristóbal' como segundo mayordomo porque él y el primer mayordomo no se llevaban, y me pidió el traslado y si no él renunciaría. Entonces después de unos momentos yo le dije a él que en aquel tiempo yo no podía hacer un traslado de ningún empleado por ser muy costoso a la compañía; entonces él me dijo: 'yo no puedo seguir trabajando aquí, entonces presentaré mi renuncia', y le contesté que estaba aceptada la renuncia y que podía avisarme cuándo quería salir para mandarle la transportación, como acostumbrábamos hacerlo. Entonces él me dió las gracias por todo lo que había hecho por él, pero que se iba; entonces montó el caballo y se fué y yo seguí en mi trabajo. Eso pasó por la mañana. Entonces yo volví a la oficina de Fajardo y tenía que ir a San Juan por la tarde con mi familia; fuí a San Juan, y al regresar a las 6 ó 6½ al pasar por el Hospital Municipal de Fajardo había muchísima gente . . . paré el carro y pregunté qué había pasado y me dijeron 'Colín muerto'. Me sorprendí porque nadie lo esperaba, era un hombre bueno, fuerte, sano.''

Repreguntado por la defensa, en parte contestó como sigue:

''T.—No tenía muchas quejas de él; desde luego nosotros todos tenemos nuestras faltas.—D.—¿A pesar de las faltas que todos nosotros tenemos, qué concepto le merecía a usted el acusado?—T. —Muy bien hasta los dos últimos meses.—D.—¿En los últimos dos meses en qué consistió el cambio?—T.—Tuve algunas quejas de la colonia.—D.—¿Del Sr. Matta tuvo quejas?—T.—Sí, señor. Eso fué en ocasión de elecciones y de la política, y Colín Matta me decía que si yo podía trasladarlo a otra colonia porque Vázquez maltrataba a los trabajadores y de vez en cuando lo encontró bajo la influencia de bebidas. — D. — ¿Eso le decía Colín?. — T. — Sí señor, como principal.—D.—¿Alguna vez usted lo encontró personalmente a él en esas condiciones?—T.—No, señor.—D.—¿Le veía a menudo?—T.—Pocas veces.—D.—Alguna otra persona que no fuera el Sr. Matta se le quejó a usted de este señor?—T.—Mi ayudante de campo general.—D.—¿De qué se quejaba?—T.—Lo mismo, y que el

primer mayordomo de San Cristóbal no estaba contento con el trabajo del segundo mayordomo.— . . . —D.—¿Si él no hubiera presentado su renuncia usted se la hubiera exigido?—T.—Sí, señor, fué el objeto del viaje por la mañana pero no lo encontré.—D.—¿A pesar de ser el objeto de su viaje usted no se detuvo, sino él a usted?— T.—Sí, señor, porque él venía y yo salía en el carro e hizo con la mano así; de todas maneras hubiera parado.''

Seguidamente compareció José Feliciano, capataz de cultivo que trabajaba bajo las órdenes del interfecto y del acusado. El 12 de noviembre de 1932 a eso de la una y media de la tarde el acusado lo encontró y le dijo que Matta lo había hecho botar y que ese día tenía que tener con Matta un disgusto en la oficina o fuera de la oficina. El testigo permaneció callado pero cuando Vázquez, el acusado, se fué, le mandó aviso con un peón a Matta para evitar un choque. En ese momento se presentó Marcelino Meléndez a caballo y le contó lo ocurrido, saliendo Meléndez en busca de Matta. Volvió a ver al acusado como a las dos y media o las tres de la tarde que iba como para ''Montida.'' El testigo es primo del interfecto.

Llamado a declarar Marcelino Meléndez, mayordomo de la colonia ''San Cristóbal'' bajo la dirección de Matta, a quien vió en la tarde del suceso, como a las cuatro, en ''Montida'', dándole la noticia de que Vázquez iba a tener un disgusto con él. Matta contestó: ''No tenga cuidado que él no es ningún loco, él tiene que razonar para poder tener el disgusto.'' Se fué y no volvió a ver más a Matta. Asistió a su entierro al día siguiente.

Ramón Pereira, carretero de la colonia ''San Cristóbal'', declaró haber visto al acusado entre 3 y 4 de la tarde en el camino mitad de Montida y San Cristóbal. Sintió una detonación, miró hacia atrás y vió a don Colín herido. Estaba acostado boca arriba sobre la vía. Habló con él y le dijo ''que había sido don Manuel quien lo había herido''. Lo levantaron entre tres y lo colocaron más adelante a la som-

bra de un árbol. Fué a buscar su carro y en él llevaron al herido al hospital.

Llamado entonces el Doctor Manuel Carreras, médico cirujano, declaró que practicó la autopsia del cadáver de Matta que era un hombre blanco, de mediana estatura, de marcada robustez, como de treinta y ocho años y presentaba una herida de bala en la región braquial interna, correspondiendo al tercio superior del brazo derecho, otra herida de bala con orificio de salida en la misma región braquial izquierda, pero en el tercio superior del mismo brazo derecho y otra herida de bala en la región pectoral lateral del tórax correspondiendo a la línea axilar. Abierta la caja toráxica se desbordó una gran cantidad de sangre recogiéndose como tres litros y medio. La muerte se debió a la herida de bala que interesó órganos importantes.

José Juan Díaz, trabajador de la colonia ''Montida'' se cruzó con el acusado el 12 de noviembre, 1932, en el camino de ''Santiago'' y a poco sintió los disparos, ''miré atrás y era don Manuel que le disparó a don Colín.'' Sintió como cuatro o cinco, seguidos.

Gil Pérez, iba con el anterior testigo José Juan Díaz el día del suceso y en el cruce de Montida a San Cristóbal se encontró con el acusado que iba a caballo. Vió venir a don Colín y a don Elías y sintió unos disparos. Miró atrás y vió a don Manuel disparando. Corrió, llamándole la atención diciéndole, ''don Manuel pare, no dispare más, don Manuel''.

Tanto la declaración de Díaz como la de Pérez son largas y confusas. Revelan el temor, especialmente la del primero que dijo que se metió bajo unos alambres, y el aturdimiento que naturalmente produce un hecho de la naturaleza del que estamos investigando que súbitamente se presencia. Es la declaración del testigo que sigue, Nicolás Elías, la que da una idea más clara de lo ocurrido.

Dijo que trabajaba bajo las órdenes inmediatas de Matta

como listero y en la tarde del 12 de noviembre de 1932 lo acompañaba en "Montida" que es una parte de la colonia "San Cristóbal" que queda un poco distante de la finca prin-. cipal, cuando "nos encontramos con Marcelo Meléndez y habló con don Colín y le dijo que había tenido noticias de que don Manuel había dicho que dondequiera que se encontraran iban a tener un disgusto, que estuviera preparado. Eso le dijo don Marcelo a don Colín. Don Colín me decía: "Qué le parece don Colo, él no es ningún loco, antes tenemos que razonar, no le he hecho nada.' Seguimos andando, él en un potro y yo en otro; cogimos la carretera y cogimos el camino de la finca 'Montida' y 'San Cristóbal' y al llegar a un paso de la finca que se llama 'San Francisco', recto, como a una distancia de 4 ó 500 pies vimos venir a don Manuel y yo le dije a don Colín 'allá viene Don Manuel' . . . . Cuando llegamos a una distancia como de 4 ó 5 pies Don Manolo le disparó, y entonces continuó delante de él, (Matta) se tiró del caballo, sacó el revólver y le disparó."

Nada dijo el acusado al interfecto antes de dispararle. Tampoco el interfecto al acusado. "Aquello fué tan rápido. Más tiempo me tomo en decirlo que como pasó." El acusado hizo como "cuatro o cinco disparos, no estoy seguro." El interfecto "creo que llegó a disparar solamente dos balas . . . con el brazo derecho levantado porque el acusado estaba a caballo y él a pie en el suelo."

Contestando la pregunta "¿No sabe cuál disparo le hirió?" dijo: "No, señor, me dí cuenta cuando estaba herido, cuando salió tambaleándose y nos dijo: 'Ay Don Colo no me deje matar, y Juan Pérez estaba más alante y fuimos y lo cogimos."

Mientras eso pasaba el acusado estaba "quieto como a 3 ó 4 pasos de nosotros y seguido viró por el mismo camino. Al pasar por el lado de Don Colín dijo: 'No te mato en el suelo porque soy una persona decente'."

Continuó preguntándose y repreguntándose largamente al testigo. Lo que dejamos extractado permaneció a nuestro juicio en pie como la verdadera substancia de su declaración.

Terminada la prueba de cargo introdujo la suya el acusado, consistente en los testimonios de su esposa Rosa Díaz, en los de Nicolás Elías y José Torres y en el suyo propio.

La Sra. Díaz se refirió a las relaciones de amistad existentes entre el acusado y el interfecto y sus respectivas familias, buenas hasta dos meses antes de la desgracia en que hubo desavenencias porque Matta creyó que su esposo y ella le contaban a su esposa sus asuntos amorosos con cierta campesina. Matta fué a su casa y le dijo: "Doña Rosa, yo le suplico que no ande con Ana (su esposa) que no quiero que salga."

Nicolás Elías, cuya declaración como testigo de cargo ya conocemos, fué llamado por el acusado para declarar como declaró sobre el hecho de habérsele resistido el caballo que montaba a una joven muy agraciada del "Duque", barrio de Naguabo al pasar por cerca de las casas del acusado y del interfecto estando en ellas sus esposas. El caballo era del acusado. El testigo contestó que nada sabe sobre si con motivo del incidente se hablaron la esposa del interfecto y la muchacha. Él fué llamado para sacar el caballo que se resistía.

José Torres dijo que residía en Patillas, que conoce a Vázquez por unos cuatro años y conoció a Matta por unas dos semanas, que "el 12 de noviembre, como a la una de la tarde, estaba yo en un grupo al lado de la oficina de pago y él pasaba montado a caballo y preguntó si habíamos visto a Manuel Vázquez y yo le dije que no lo había visto y preguntó '¿no sabe si estará en el pueblo o en la colonia?' y le contestamos los que estábamos allí, y especialmente yo, 'no sé seguro dónde estará'. Cogió de la oficina para abajo y dijo: 'este perro, canalla, dondequiera que nos encontremos vamos a tener un disgusto serio; o me mata o lo mato

yo.' . . . Cuando él se fué para abajo nos quedamos comentando diciendo: '¿qué pasará entre el mayordomo primero y el segundo?' . . . y uno dijo 'sabe Dios si es por alguna mujer'; y como a los 15 ó 20 minutos apareció el Sr. Vázquez, mayordomo segundo, y yo le dije: 'Oíga Don Manuel, aquí pasó don Colín buscándolo a usted, que dondequiera que se encontraran iban a tener un disgusto serio, "este perro canalla, dondequiera que nos encontremos o me mata o lo mato." ' Y cogió para el pesebre."

Por último declaró el acusado, en resumen, como sigue: Conoció a Matta desde que fué a trabajar a la colonia. "La amistad de nosotros llegó a tal extremo que . . . algunos domingos almorzaba en casa su familia, otras veces nosotros en la de él; salíamos juntos al campo."

Esa amistad se enfrió en los últimos dos meses. "Él tenía en el campo una muchacha que se enamoró y salíamos juntos y él se metía en calidad de novio de ella y parece que su esposa lo averiguó y le llamó la atención y tuvieron disgustos, y él me llamó la atención por primera vez y me dijo que procurara evitar que él se suponía que era mi esposa, y nosotros no nos ocupamos de esa tontería. . . . Un día vino a pedirme un caballo de mi propiedad, prestado; no me dijo para qué era, se lo presté, era para mandarlo al campo para la joven esa. Ella vino al pueblo en el caballo y cuando subía del pueblo . . . el caballo, al pasar cerca de casa, se aguantó y la señora que estaba allí la llamó, entró y hubo conversación pero no sé qué pasó entre ellas."

"Al tropezarse conmigo me llamó la atención de nuevo, que no hubiera permitido que fuera la joven, que lo que procedía era prohibirle terminantemente a la esposa que fuera a la casa; y yo le dije que no me atrevía, siendo una persona de respeto, echarla de la casa. Me dijo que procurara evitar que fuera a casa porque eso podía traer un disgusto serio con nosotros . . . . como dos o tres días antes de las elecciones él se trajo la muchacha al pueblo a vivir con ella y

el día antes de la desgracia lo supo la esposa de él y el día de la desgracia. . . . El día 12 de noviembre como yo ví que continuaba con esa frialdad, llegué a tomar la resolución de ver si podía hablar con los jefes de la Fajardo para ver si podía conseguir el traslado o presentar la renuncia porque ya veía que iba encaminado a tener disgustos, y como a las 10 de la mañana encontré al primer jefe de la Compañía, Mr. McCoy . . . iba en automóvil y le hice seña que parara y hablé con él y le dije que próximamente había dos meses que el mayordomo primero tenía disgustos conmigo, que veía que era por tonterías que no valían la pena pero. que podía ocurrir algo, y le pedí traslado y me dijo que un traslado a la compañía le costaba dinero y le ocasionaba trastorno, y hablé de renunciar y me dijo que pensara y si no se podía arreglar presentara la renuncia cuando lo quisiera. . . Después yo venía como a las 12 y media, que venía de recortarme, . . . del pueblo . . . me encontré cerca de la oficina un grupo de trabajadores, que era día de pago, y al pasar . . . me llamaron la atención con respecto a unas palabras que él había dicho de tener un disgusto conmigo; y cogí mi caballo y fuí al pesebre y le dije al pesebrero que me ensillara mi caballo y fuí a casa y le dije a mi esposa que empaquetara muebles y lozas que iba a buscar un *truck* para trasladar la residencia esa tarde o por la mañana e irme; y cuando le advertí eso a la señora, yo tenía el revólver de mi uso y lo eché al bolsillo y me dirigí a la colonia 'Esperanza' a buscar pasto para los animales para evitar cualquier cosa, y cuando iba por el camino ese de referencia, donde pasó el suceso, había tres caminos, yo pregunté para tratar de no encontrarme con él, y dió la casualidad que cogí el camino de 'Montida' y cuando cogí el camino, hay un cañaveral y como las cañas estaban grandes, no lo pude ver y él venía con el listero en dirección opuesta a la mía, y cuando llegué a la curva que venían ellos y no pude evitarlo, y al verlo a él toqué el caballo con la espuela para pasar a ver si podía evitar el

disgusto; pero como el caballo acostumbraba parar siempre que nos encontrábamos, . . . al llegar al lado de él el caballo se paró de golpe y él trató de sacar el revólver y yo saqué el mío y él hizo el primer disparo y me tiré de mi caballo, pero el caballo se resistió y me paré y el caballo se me fué de las manos; entonces él avanzó y me tiró el segundo tiro, pero al disparar el tiro el caballo se le espantó y se fué y él me disparó y yo también. Después él corrió pidiendo socorro y yo me quedé en el mismo sitio. Yo lo que quise fué defenderme, y él corrió pidiendo socorro. Al único que ví fué a Nicolás Elías, que estaba como a 200 pies, y vino a recogerlo y mientras lo recogía yo cogí mi caballo y vine al pueblo, para evitar cualquier cosa porque sabía que tenía familia en Naguabo y fuí al cuartel a entregarme.''

Luego el fiscal le hizo la siguiente pregunta: ''¿Quién hizo el primer disparo?'' y contestó: ''Nosotros dos. . . . Un disparo de ambos al mismo tiempo.''

Tal fué substancialmente la prueba practicada. Su mera exposición es suficiente para desestimar el error. Resuelto el conflicto por el jurado en pro de la prueba de cargo, su veredicto está ampliamente justificado. Y en cuanto a la resolución del conflicto, nada demuestra pasión, prejuicio, parcialidad o manifiesto error; al contrario, sano criterio por parte del jurado.

Sólo falta examinar el error atribuído a la corte sentenciadora al negar la concesión de un nuevo juicio. Se alegaron como fundamentos para solicitarlo, la moción de traslado, el haber ordenado la corte que agentes de orden público protegieran la vida del acusado al extremo de verse éste obligado a ir y venir de la corte al hotel en que se hospedaba custodiado por un detective, permaneciendo, mientras se sustanciaba el juicio otro agente sentado al lado izquierdo de la silla testifical, dentro del salón de la corte, a una distancia de dos metros más o menos del sitio en que se encontraba el acusado, y otros extremos que el acusado manifestó no

poder señalar específicamente porque no tenía en su poder el récord de la causa donde constaban.

Los motivos que tuvo la corte para negar la petición los consignó en su resolución de noviembre 21, 1933, como sigue:

"La Corte no dió orden alguna para los efectos alegados en la transcrita alegación, a ningún agente de orden público, ya que ello estaba fuera de las atribuciones del Tribunal. Por la misma razón no intervino la Corte en las demás medidas adoptadas para la garantía personal del acusado fuera del Tribunal, ignorando la Corte la realidad de las mismas. Tampoco ordenó la Corte que, durante la tramitación del juicio, agente alguno de orden público fuera destacado cerca del acusado, para la protección de éste. Y no se ha demostrado que en caso de que las referidas medidas se hubieran adoptado las mismas hubieran llegado a conocimiento del Jurado y hubieran influído en su veredicto. Ni tampoco hubo demostración o acto alguno del acusado durante la sustanciación del proceso, indicativo de que estuviera el mismo en posición desventajosa para su defensa, o de que estuviera el mismo impedido de defenderse con espontaneidad.

"La Corte admite que no estuvo nunca convencida de la necesidad de que el caso se trasladase a otro distrito, y sostiene ahora su criterio sobre el particular. Por imperativos de la naturaleza humana, en casi todos los casos criminales, los familiares de la persona agraviada, sienten más o menos intensa aversión hacia todo acusado por el agravio inferido a dicho familiar. Para evitar, sin embargo, que ese sentimiento de hostilidad hacia el acusado, por parte de dichos familiares, se traduzca en daño físico a su persona, están las autoridades encargadas de mantener el orden público. Si el mero temor de ese daño al acusado por parte de dichos familiares determinara la necesidad del traslado, menester sería, entonces, celebrar todos los juicios criminales por delitos cometidos en un Distrito, en cualquiera de los otros Distritos Judiciales de la isla, lo que evidentemente no es compatible con las normas actuales del procedimiento establecido para dichos casos, ni una mejor, más rápida y expedita administración de Justicia en los mismos.

"Además de esto, no se alegó ni se demostró la manera específica en que la alegada prominencia de la familia del fenecido en este caso hubiese influenciado a los señores del jurado, en forma tal que estuviera impedido el cuerpo de Jurados del Distrito para entender en este caso, de modo imparcial, justo y ecuánime.

"Ciertas alegaciones de la moción solicitando el traslado, determinaron que la Corte considerase el uso de sus poderes inherentes para mantener sin perturbación alguna el orden en el edificio del Tribunal y en los terrenos en que ubica el mismo, y adoptó al efecto precauciones para garantizar dicho orden así como la integridad personal del acusado en todo momento en que éste se encontrase en dicho edificio y en dichos terrenos, (solar de la Corte); pero esas precauciones se tomaron siempre en ausencia del Jurado, sin que haya prueba alguna ante la Corte de que el Jurado conoció las mismas, mientras entendía en el caso, ni de que las mismas. hubieran influenciado la mente de los Jueces de hecho que intervinieron en el proceso. Sobre las precauciones adoptadas por las autoridades encargadas de mantener el orden público fuera del Tribunal y de sus terrenos, la Corte no tiene conocimiento de clase alguna.

"Durante la vista de este incidente sobre nuevo juicio, se presentó evidencia al efecto de que varios familiares del fenecido, durante el día de la vista, visitaron el hogar del Sr. Márshal de esta Corte. La amistad que puede unir a éste con dichos familiares y la visita de éstos al hogar del primero, no se ha probado que haya sido conocida de los señores del Jurado que intervinieron en el proceso, ni se ha demostrado que ello haya influído en la mente de los mismos con relación al desempeño de la misión de juzgadores. Y la Corte no puede llegar a dicha conclusión por inferencias."

Nada es necesario agregar. Ningún motivo justo se demostró que existiera para la concesión de un nuevo juicio. El error señalado no existe. Se trata de una sentencia dictada de acuerdo con los hechos y la ley. El acusado ha tenido todas las amplias garantías que nuestras instituciones le otorgan y la justicia ahora exige que la pena que se le impuso, que está dentro de los límites de la preestablecida por el legislador para el delito que se le imputó y probó que cometiera, sea cumplida.

*Debe declararse el recurso sin lugar y confirmarse la sentencia apelada.*