EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PEDRO DEFILLÓ, acusado y apelante.

Núm. 8400.—*Sometido:* Febrero 20, 1941. *Resuelto:* Abril 17, 1941.

*A. Lastra Chárriez, A. D. Marchand Paz y Carlos Santana Becerra,* abogados del apelante; *Hon. Procurador General George A. Malcolm y R. A. Gómez, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

En enero 25, 1937, el fiscal del distrito formuló acusación contra Pedro Defilló imputándole un delito de asesinato en primer grado cometido tres días antes en Mayagüez al agredir con un revólver, con malicia expresa y propósito firme y deliberado de arrebatarle la vida, a Francisco Roméu, haciéndole tres disparos e infiriéndole varias heridas de bala a consecuencia de las cuales murió momentos después.

En enero 26, 1937, se leyó la acusación con entrega de copia al acusado. Se le concedieron diez días para entrevistarse con sus abogados y contestar, lo que hizo en efecto en febrero cuatro siguiente asistido de abogado alegando no ser culpable y pidiendo juicio por jurado.

En enero 17, 1938, solicitó el traslado de la causa a otro distrito. Se opuso el Pueblo por su fiscal. Se celebró una vista practicándose prueba y la corte finalmente declaró la petición sin lugar.

En junio 23, 1938, solicitó del juez que se inhibiera del conocimiento del asunto y que luego de acordada la inhibición el caso se trasladara a otro distrito, y al día siguiente presentó otra moción alegando que el nombramiento del Juez Arjona para actuar durante el término para el cual se había señalado la vista de la causa era nulo, debiendo abstenerse de entrar en los méritos de la causa. Se opuso otra vez el Pueblo por su fiscal y la corte declaró ambas mociones sin lugar y procedió a la celebración del juicio que comenzó en junio 29, 1938, y terminó el treinta sin que el jurado llegara a un acuerdo en cuanto al veredicto a rendir.

En enero 16, 1939, se llamó de nuevo la causa para juicio, disolviéndose el jurado el diez y nueve por no haber llegado a un veredicto.

Seis meses después, en junio 29, 1939, se llamó la causa por vez tercera para juicio. Celebrado, el treinta de junio el jurado declaró culpable al acusado de homicidio voluntario. En julio 10 se presentó una moción de nuevo juicio que la corte negó, dictando sentencia imponiendo al acusado cinco años de presidio.

Se interpuso entonces el presente recurso de apelación radicándose al fin el alegato del apelante en enero 22, 1941. La vista del recurso fué celebrada el veinte de febrero último.

Tres errores se señalan. Los dos primeros se imputan como cometidos por la corte al trasmitir instrucciones al jurado y el tercero al dictar sentencia.

Para resolver con mayor acierto los señalamientos de error, conviene que analicemos antes la prueba.

Ocho testigos de cargo declararon. El primero, el Doctor Nelson Perea dijo que en la noche del 22 de enero de 1937, como a las ocho y veinte, llevaron a su clínica al Sr. Roméu, submárshal de la corte del distrito, con tres heridas de bala, moribundo. Al llegar tenía puesto un cinturón con una baqueta de revólver sin el revólver dentro. Fué colocado sobre la mesa de operaciones y se le pusieron algunas inyecciones. A poco murió. Cuando como a los veinte y cinco minutos llegó el Juez Moscoso y ordenó la autopsia, la practicó. Tenía tres heridas.

Quitóse el fiscal su camisa y el testigo fué señalando en su cuerpo dónde estaban las heridas, así: la primera examinada en la región axilar posterior. Esta es la axila y se encontraba entre la sexta y séptima costilla, al borde de la escápula. Tenía sólo orificio de entrada. Iba hacia abajo y hacia adelante, hacia el lado derecho. Pasó el pulmón y el diafragma, cogió el colon descendente y lo perforó, perforando el mesenterio, vaso sanguíneo que surte los intestinos. La herida era mortal por necesidad.

Las otras dos eran leves, musculares, no interesaron vaso alguno. Tenían tatuaje—incrustación de la pólvora en el tejido y la quemadura que la misma produce. Los orificios

de entrada estaban en la escápula—omoplato—detrás, en la espalda, "tanto en la región escapular como en la espalda" y los de salida en el tercio anterior del brazo anteroposterior. Su trayectoria "de detrás hacia adelante."

La causa de la muerte fué una hemorragia abdominal y otra del pulmón izquierdo. Roméu era hombre como de cinco pies diez pulgadas, corpulento.

Llamado Aníbal San Antonio manifestó que se encontraba en Mayagüez, en el "Wonder Bar" con sus compañeros de la pagaduría federal Otis Ramírez y Adán Raldiris. Allí se encontró con el acusado. El bar se compone de un salón que está dentro, atrás, y un saloncito más bajo que da al teatro Yagüez, con salida. En la parte delantera está la cantina. Él estaba con sus amigos en el salón alto y desde allí se ve el bajo. Habló de política liberal con Defilló.

Roméu estaba en la parte baja, y al oírlos hablar de política dijo que los liberales tenían que botarnos a todos nosotros y que la PRRA era para ellos y que nos iba a acusar porque estábamos hablando de política. Nadie contestó. El acusado se levantó. En el acto nos levantamos todos. El acusado bajó donde estaba Roméu. Yo me marché. Me fuí al recital de González Marín y estando en el teatro, al lado del Jefe Vega, se oyeron tres detonaciones. No sabe de dónde salieron. No volvió al bar.

En repreguntas contestó que se levantó y se fué porque Roméu era hombre que siempre andaba armado, por temor de que fuera a haber un altercado. También que oyó hablar a Roméu, que su actitud no era pacífica, que un hombre que insulta no puede ser pacífico. Su voz era provocadora, sus palabras fuertes, "palabras que hacen que uno desaparezca de un sitio."

Otis Ramírez fué con sus amigos la noche de autos al Wonder Bar, sentándose en el salón de arriba. Conoció allí al acusado que tomó una copa con ellos. Hablaron de política y Roméu dijo "que nos iba a reportar porque nosotros éramos empleados federales y estábamos hablando de polí-

tica, y entonces Defilló se levantó, y yo me fuí en seguida.''
Defilló se dirigió al salón de abajo.

Celso Guzmán estuvo en la noche del suceso en el bar y
vió al acusado tomando en el mostrador unas copas con unos
amigos. Luego entraron al primer salón, se sentaron, pidie-
ron una botella de ron y hablaron de política. Roméu estaba
bebiendo en el otro salón más bajo primero con Pepito Roma-
guera, luego solo, y dijo, dirigiéndose al grupo: ''Déjense
de estar hablando de política porque ustedes son empleados
de la PRRA y los voy a reportar y los voy a hacer botar.''
Los del grupo ''salieron . . . aprisa'', el acusado ''salió por
la parte del servicio del centro donde estaba Pachín Roméu''
y en ''actitud pacífica,'' manifestó algo a Roméu que el tes-
tigo no pudo oír, contestando aquél: ''Yo no me he dirigido
a usted'' y ''se quitó el gabán y tenía un revólver y como
estaba en actitud violenta le dije: 'Pachín, ten calma, tú
te alteras demasiado, cállate la boca, respeta a los hombres.'
Y dijo él: 'Lo que yo quiero es que se vayan de aquí, yo
quiero beber solo, váyase de aquí.' Y le dije: 'Yo me voy.'
Y entonces le dije a Defilló: 'Mire, caballero, véngase'; y él
accedió a la súplica mía y le puse el brazo por el hombro y
cuando seguíamos así, Defilló se paró. Ya Pachín se había
quitado el gabán y se sentó en la silla, y le dice Defilló a
él: 'Mire caballero, usted me ganó, pero usted no tiene
razón.' . . . Y entonces, vino un empleado de Tuto a avi-
sarle a Defilló que tenía que quitar el carro de frente al
parque, porque iban a sacar las bombas, y entonces Defilló
se fué, dejó el sombrero.''

Regresó el acusado como a los doce o quince minutos.
Entró por la puerta que da al teatro Yagüez. Me le fuí
detrás y le dije: ''Mire, señor, la botella de ron que usted
ordenó, está en la casa.'' Pidió que se la trajeran, se sentó
y me dice: ''Viejo, ¿quieres el palo?'', y le dije: ''No, señor,
gracias'', y se levantó, y al levantarse Roméu le dijo: ''Com-
pay ¿quiere el palo?'' y Defilló le contestó que acabando de
recibir el insulto no podía aceptar la invitación. Entonces

Pachín (Roméu) dice: "Los que están al lado cuidado" y al mismo tiempo hace un gesto, llevando la mano a la cintura, y al decir "cuidado" sonó el primer disparo y luego los otros dos. El disparo salió del lado del acusado, pero no puede apreciar si fué el acusado el que lo hizo. Estaba fijo en Pachín que no tenía revólver en la mano, que sacó ésta de la vaqueta, dió una vuelta y cayó. Entre tanto sonaron los otros dos disparos y se fijó en el acusado que tenía en sus manos un revólver que tiró a un patio contiguo y cuando vino la policía se entregó.

Baudilio Vega, Jefe de Distrito de la Policía Insular se encontraba en el teatro Yagüez y sintió tres disparos y salió inmediatamente para el bar y al llegar salía Defilló. Celso Guzmán lo señalaba como la persona que había hecho los disparos y entonces Defilló le manifestó que él había sido. Le preguntó por el arma y le indicó el sitio donde la había lanzado. El guardia Raya la encontró, un revólver Colt, calibre 38, tenía tres cápsulas disparadas y dos sin disparar. Lo reconoce entre dos que se le presentan.

Refiriéndose a Roméu dijo que estaba acostado, la parte superior de la espalda descansaba en uno de los escalones de la escalera que conduce al servicio sanitario. Hizo manifestaciones que le habían herido en la espalda; no culpaba a nadie. Ocupó otro revólver Colt a la derecha de Roméu, descansando sobre la parte superior del brazo derecho. El revólver tenía seis cápsulas sin disparar. Ninguna disparada. La vaqueta era sin tapa y de ella pudo salirse el revólver.

Ernesto Irizarry, policía insular, estaba en el teatro, oyó tres disparos, corrió hacia el café, arrestó al acusado quien le dijo: "Si yo le disparé fué porque me provocó, fuí insultado." Vió a Roméu en el suelo. Reyes trataba de levantarlo. El Jefe Vega mandó levantarlo y tenía manchas de sangre por detrás y lo llevaron a la clínica. El revólver estaba en el suelo cuando el Jefe Vega lo recogió.

Los últimos testigos del fiscal fueron Angel Ríos y Víctor Barrios. El primero se fué del bar antes de los disparos y el segundo que tuvo ocasión de presenciarlo todo, nada concreto dijo en resumen. Tras una serie de preguntas, repreguntas, objeciones e interrupciones terminó diciendo que no sabía quién hizo los disparos.

La defensa presentó de nuevo a Celso Guzmán, y a Celestino Nieves, Félix Dicks y Nicolás Soto Ramos.

Guzmán afirmó que el acusado cuando iba saliendo del bar después del suceso, con el único que habló fué con el Jefe Vega. El fiscal le interrogó sobre si había hecho en una declaración anterior la manifestación de que el acusado había hablado con uno de los guardias. El testigo mantuvo que lo cierto era lo que estaba declarando, y como el fiscal inquiriera de él sobre si alguna vez le había declarado que el acusado le había dicho al Jefe Vega: "Lo maté, porque me iba a matar", le contestó que no se lo había declarado porque no fué interrogado sobre el particular.

Celestino Nieves estaba en el Wonder Bar. Vió entrar a Roméu. Se sentó en la terraza de abajo a tomar. Romaguera quiso llevárselo pero él se negó. Luego entró Defilló y se sentó con unos amigos de la PRRA y se pusieron a hablar, levantándose Roméu provocando a Defilló. Intervino Guzmán y como le avisaron a Defilló que su carro estaba mal parado, salió, regresando como a los diez o doce minutos. Entonces Roméu lo invitó a darse un palo con él y Defilló rehusó, diciendo Roméu: " 'Bueno, si no quiere darse el palo se va al carajo' y se levantó insultándolo, y haciendo uso el señor Roméu de su revólver, y entonces el señor Defilló sacó el revólver y le disparó tres tiros al señor Roméu rápidamente."

Félix Dicks estaba en el teatro Yagüez, oyó los tres disparos y se asomó por una ventana viendo al Jefe Vega "que cogió del suelo un revólver, cerca de la mano de Pachín Roméu, con un pañuelo y olió el revólver."

Nicolás Soto, periodista, entró al bar y vió y oyó cuando Roméu increpó de mala manera a Defilló y sus compañeros, diciéndoles: "que se dejaran de hablar de política, que eran empleados de la PRRA, que eran unos sinvergüenzas, que él era un funcionario público y no permitía que se hablara de política, que él era unión republicano, que estaba en el poder. Entonces, el señor Defilló salió de la mesa y dijo a Roméu que por qué se expresaba de esa manera, que ellos eran personas decentes. Entonces Roméu, de una manera descompuesta, le dijo que se fuera al carajo, que se largara de allí. . . . Defilló le dijo a Pachín: 'Usted me ganó, aunque no tiene razón.' Una frase así. Entonces vino el dueño del Wonder Bar a decirle a Defilló que fuese a poner bien el carro. Entonces Defilló salió fuera y retornó a los diez o doce minutos, más o menos. Guzmán le dijo que tenía una botella de ron que quedaba allí. Defilló cogió la botella y ofreció un palo a Guzmán. Él le dijo que no bebía. Defilló se echó un palo y se lo tomó. Fué hacia la percha a coger el sombrero; entonces Pachín Roméu, desde abajo le dijo: 'Vamos a darnos un palo.' Defilló le contestó: 'cómo vamos a darnos un palo' si Roméu, él, lo había estado insultando momentos antes. Entonces Pachín Roméu se levantó sacando el revólver, y dijo: 'Quieto todo el mundo, voy a acabar con esto.' Entonces, rápidamente Defilló le hizo tres disparos al señor Roméu."

Tal la prueba que hemos resumido procurando conservar en lo posible las propias palabras de los testigos.

■ El primer señalamiento de error se formula así:

"La corte inferior cometió error, en sus instrucciones al jurado al relacionar tergiversadamente cierta evidencia producida contra el acusado y apelante al expresar:

" 'Uno de los testigos en este caso declaró—creo que fué el testigo Vega—declaró que en el momento en que llegó, segundos después de los disparos, al sitio de los hechos, el herido, que estaba lanzado en el piso en la forma que él lo descubrió, le dijo: "me han herido *por* la espalda" (Itálica nuestra). Otro de los testigos hizo también

ciertas manifestaciones sobre palabras del acusado.' (Págs. 9 y 10 Inst.)

"Siendo lo cierto que lo declarado por el referido testigo Vega sobre lo dicho por el herido fué:

" 'Él hizo manifestaciones de que le habían herido *en* la espalda' (líneas 8 y 9 pág. 51 Transc. Ev.) (Itálica nuestra).

"Continuando la corte su tergiversado relato del testimonio del mencionado Vega dando a tal relato indebido énfasis . . . al expresar: . . . .

" 'Las manifestaciones hechas por una persona momentos después de haber sido objeto de un ataque ilegal y tan pronto como puede hablar conscientemente de manera voluntaria o respondiendo a preguntas que se le hacen antes de adquirir dominio para hacerlas, forman parte del "res gestae" . . . .' "

No hay duda de que según el récord taquigráfico el testigo no dijo "por la espalda" si que "en la espalda." Tampoco la hay de que si se da énfasis al distinto significado que pueden tener ambas expresiones, la diferencia existe y pueden inducir a un serio error.

Surge sin embargo de la actuación del jurado que si es que se fijó en la diferencia no la tomó en consideración ya que el veredicto que rindiera fué de homicidio y no de asesinato.

Además, el acusado no advirtió a la corte en forma alguna de su error, ni excepcionó la instrucción. No hubo perjuicio. No hay fundamento para la revocación. Véanse 14 R.C.L. 780, y la cita de la propia obra que transcribiremos al considerar el segundo señalamiento de error, que versa también sobre las instrucciones.

Se formula como sigue:

"La corte inferior cometió error en sus instrucciones al jurado al dar instrucciones sobre defensa propia fundada en peligro real y ninguna sobre defensa propia fundada en peligro aparente, que era la teoría del acusado y apelante en su defensa, excepto la siguiente instrucción ambigua y conducente a error (misleading):

" '. . . Pero si el peligro no es real, es aparente, basta con que las circunstancias sean de tal naturaleza que aunque exista el peligro

aparente, esto es, que el peligro es real y que no puede evitarlo sino dando muerte a su adversario.' "

La instrucción es confusa, pero existe, y la confusión quizá se deba más que al juez al taquígrafo, porque siguiendo el desarrollo lógico del pensamiento del juez se ve claramente que lo que probablemente dijo fué:

"Pero si el peligro no es real, es aparente, basta con que las circunstancias sean de tal naturaleza que aunque *sólo* exista el peligro aparente, *el acusado crea* que el peligro es real y que no puede evitarlo sino dando muerte a su adversario."

Además, lo transcrito en el señalamiento es sólo un párrafo de la instrucción sobre la materia que es amplia y expone la ley en su totalidad, y tampoco se pidió aclaración, ni se formuló excepción, y ello era necesario para invocar con éxito el error en la corte de apelación.

Resumiendo la jurisprudencia sobre la materia, dice Ruling Case Law:

"Difícilmente es posible para una corte dar instrucciones en forma tal que abarquen todos los puntos de vista posibles desde los cuales pueda ser considerado el caso o tener en cuenta todas las excepciones a las reglas generales de la ley. Por tanto, está generalmente establecido que es el deber de los letrados auxiliar a la corte en sus funciones de instruir al jurado y el propósito mismo de permitir que se soliciten instrucciones es el que se pueda informar ampliamente al jurado de todos los principios de ley que gobiernen el caso y que la corte tenga la oportunidad de corregir inmediatamente cualesquiera equivocaciones que pueda haber cometido al instruirlo. La regla ha quedado, por tanto, firmemente establecida que cuando la instrucción de la corte no cubre todos los aspectos del caso, los letrados están obligados a llamar su atención a la omisión habida por medio de una adecuada solicitud, pues de otro modo estarían impedidos de basarse en tal omisión para solicitar la revocación. La regla ha quedado también perfectamente establecida de que la parte debe, si ése es su deseo, pedir a la corte que dé sobre cualquier punto instrucciones más definidas, más específicas o más completas. Del mismo modo, cuando la corte ha expresado una regla de ley correctamente, si la parte desea que se le informe al jurado respecto a las limitaciones de la misma, debe solicitar de la corte que así lo haga.

Y al aplicar la regla de que meras omisiones no son fatales en ausencia de solicitud para que éstas se suplan, se ha resuelto que el dejar la corte de explicar el significado de una palabra o de una frase en una instrucción, no es base para revocar en ausencia de una súplica para que se defina tal palabra, y que una sentencia en un caso criminal no será revocada porque la corte haya dejado meramente de instruir sobre la materia de coartada a menos que una instrucción especial sometiendo la cuestión de coartada se haya solicitado de la corte o se haya anotado una excepción oportunamente. Se ha resuelto asimismo que cuando un juez al hacer el resumen de la evidencia omite o se refiere inadecuadamente a partes de la evidencia que los letrados consideran pertinente, es su deber llamar la atención del juez hacia tal evidencia antes de que el caso sea sometido al jurado; y que cuando la evidencia es admisible para ciertos fines exclusivamente, no comete error la corte al dejar de limitar el uso de tal evidencia en ausencia de una solicitud para que se instruya a ese efecto. De igual manera, el omitirse en las instrucciones al jurado en una acción por culpa o negligencia, una instrucción declarando expresamente que la negligencia del demandado debe haber sido la causa próxima de las lesiones sufridas por el demandante para que pueda considerarse culpable al demandado, no constituye error que dé lugar a la revocación cuando no se ha solicitado específicamente que se dé tal instrucción; pero si la misma ha sido debidamente solicitada comete error la corte al rehusar transmitirla al jurado.''

''La parte debe solicitar de la corte que dé una instrucción explicativa al darse cuenta de que existe duda respecto a si el jurado entenderá correctamente la instrucción dada por la corte, o cuando a una instrucción que es correcta en términos generales, le falta una explicación ajustada a los hechos del caso para hacerla totalmente correcta o cuando la misma pueda ser tomada en un sentido más lato del consistente con la ley o al tender a inducir a error al jurado.'' 14 R.C.L. 795.

En el mismo sentido de la cita se declara una larga serie de casos de este propio tribunal, a saber: *Pueblo* v. *Mediavilla,* 54 D.P.R. 565, 574; *Pueblo* v. *Martínez,* 50 D.P.R. 781, 783; *Pueblo* v. *Hernández,* 49 D.P.R. 419, 422; *Pueblo* v. *Vázquez,* 48 D.P.R. 425, 427; *Pueblo* v. *Nieves,* 48 D.P.R. 153, 156; *Pueblo* v. *Benítez,* 47 D.P.R. 78, 84; *Pueblo* v. *Mercado,* 46 D.P.R. 152, 157; *Pueblo* v. *Estrella,* 45 D.P.R. 462,

466; *Pueblo* v. *Maldonado,* 45 D.P.R. 417, 424; *Pueblo* v. *Macaya,* 43 D.P.R. 621, 625; *Pueblo* v. *Varela,* 42 D.P.R. 823, 825; *Pueblo* v. *Peña,* 39 D.P.R. 933, 935; *Pueblo* v. *Valentín,* 36 D.P.R. 425, 427; *Pueblo* v. *Serrano,* 35 D.P.R. 335, 337; *Pueblo* v. *Concepción,* 30 D.P.R. 479, 480; *Pueblo* v. *Matos,* 26 D.P.R. 586, 603; *Pueblo* v. *Ramírez de Arellano,* 25 D.P.R.. 263, 280; *Pueblo* v. *Boria,* 12 D.P.R. 170, 178.

El tercero y último de los señalamientos de error envuelve el análisis de la prueba.

El resumen que de ella hicimos habla por sí mismo. Actuó Roméu sin autoridad, indebidamente, al interferir con el grupo en que se encontraba el acusado, pero éste le dió muerte sin justificación. Aquéllos a quienes Roméu aludió directamente, nada hicieron. Si el acusado hubiera tomado igual actitud no se hubiera cometido el crimen.

Roméu estaba ebrio. Pudo considerársele, armado como se encontraba, como un hombre peligroso, pero el peligro pudo evitarse fácilmente. El acusado se enfrentó con él por vez primera. Tuvo oportunidad de darse cuenta exacta de la situación y eso no obstante volvió al sitio. Roméu no insistió en sus insultos. Al contrario, invitó al acusado a beber con él. El acusado rehusó y se levantó Roméu.

Difieren la prueba de cargo y la de descargo en lo que dijo e hizo Roméu. La de descargo no fué creída por el jurado. La de cargo que consiste principalmente en la declaración de Celso Guzmán, no sostiene la teoría del peligro aparente. Apenas se levanta Roméu y pronuncia su amenaza, sin tiempo para sacar su arma—si es que ésa era su intención—recibe la bala que el acusado certeramente le dispara y que lo hiere mortalmente y luego dos más. No actuó el acusado movido por el temor—real o aparente—de perder su vida o de recibir grave daño personal. Todo revela que estaba preparado para cualquier emergencia y disparó antes de que Roméu tuviera ocasión de agredirlo, si era ésa, repetimos, su intención.

No puede quejarse en verdad el acusado ni del juicio del jurado ni de la pena que la corte le impuso. El veredicto fué el más benigno que pudo dictarse bajo las circunstancias concurrentes y la pena que pudo llegar a diez años de presidio se fijó en cinco.

No hay base para la revocación que se pide. *La sentencia quedará confirmada.*

El Juez Asociado Sr. Todd, Jr., no intervino.

### EN MOCIÓN DE RECONSIDERACIÓN

### Mayo 21, 1941.

Se ha presentado en este caso por el apelante una moción de reconsideración en la que se vuelve a hacer énfasis en que las instrucciones trasmitidas por la corte al jurado son erróneas.

Al estudiar y resolver los errores señalados a ese efecto, en la opinión de abril 17 último transcribimos los señalamientos con la parte de las instrucciones impugnadas copiando del propio alegato del apelante. Revisando cuidadosamente el récord de la apelación se encuentra que las instrucciones en su totalidad certificadas por el juez sentenciador no figuran en el mismo, de suerte que ni siquiera el apelante colocó a esta Corte en condiciones de resolver las cuestiones suscitadas, habiendo ido nuestro estudio más allá de lo que el estado de los autos justificaba.

*No ha lugar a la reconsideración.*